UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

       Plaintiff,

 -vs-                             Case No. 19-CR-127-JDP

JEREMY SCHENCK,                    Madison, Wisconsin
                                     July 9, 2020
         Defendant.             1:00 p.m.

_____

STENOGRAPHIC TRANSCRIPT OF VIDEOCONFERENCE SENTENCING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON


APPEARANCES:

For the Plaintiff:

                      Office of the United States Attorney
                      BY:  JULIE S. PFLUGER
                      Assistant United States Attorney
                      222 West Washington Avenue, Suite 700
                      Madison, Wisconsin  53703

For the Defendant:

                      Ruth Law Office, S.C.
                      BY:  ROBERT RUTH
                      7 North Pinckney Street, Suite 240
                      Madison, Wisconsin  53703

Also appearing:  JEREMY SCHENCK, Defendant
                    MARIAH STIEVE, U.S. Probation Officer


Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
 1              (Proceedings called to order at 1:00 p.m.)
 2              THE CLERK:  United States District Court for the
 3    Western District of Wisconsin is now in session.  Judge James D.
 4    Peterson presiding.
 5         Case No. 19-CR-127-JDP-1, United States of America v.
 6    Jeremy Schenk.  Court is called for a sentencing.
 7         May we have the appearances, please.
 8              MS. PFLUGER:  Julie Pfluger on behalf of the United
 9    States.  Good afternoon, Your Honor.
10              THE COURT:  Good afternoon.
11              MR. RUTH:  Attorney Rob Ruth on behalf of Jeremy
12    Schenk.
13              THE COURT:  And I see Ms. Schenk on the video from the
14    jail.
15              MR. RUTH:  I don't see anyone else, Judge.  Oh, here.
16    Okay.  I see it now.  Yes.  Okay.
17              THE COURT:  Your video was locked up for a moment.
18         Mariah Stieve is also on the call with us.  She is the
19    probation officer who prepared the presentence report.
20         We're proceeding by video teleconference, and I've got a
21    written consent to proceed in this way, but let's also put it on
22    the record.  So I've made a finding for the Court that we can't
23    proceed with in-person proceedings without imposing an undue
24    risk of coronavirus infection, and I find that that's also true
25    in this case, that proceeding in person would pose an undue risk
```

1    of coronavirus infection if we were to proceed in person.  But

2    we can do it by video teleconference only if Ms. Schenck

3    consents to that, so let's get it on the record again.  Kind of

4    a belt and suspenders approach here, but, Ms. Schenck, you

5    understand that you've got a right to appear before me in person

6    for your sentencing?

7                THE DEFENDANT:  I do.

8                THE COURT:  And you're willing to proceed by video

9    teleconference and waive your personal appearance?

10               THE DEFENDANT:  Yes.

11               THE COURT:  That's how we'll do it then.

12          All right.  Here is the materials I've reviewed in

13   connection with the sentencing:  I've got the presentence

14   report, objections from the defendant that I don't believe went

15   to the guideline calculation at all but were some factual

16   clarifications, and then I got the government's statement that

17   there were no objections.  I got an addendum and a revised

18   presentence report, sentencing memoranda from both sides, and I

19   got the defendant's written allocution.

20          Let's find out if I missed anything.  Ms. Pfluger, did I

21   miss anything on your side?

22               MS. PFLUGER:  No.

23               THE COURT:  Mr. Ruth, did I get everything?

24               MR. RUTH:  Judge, I lost my sound for a second.  Could

25   I -- I want to make -- did you mention the government's

1    sentencing memo?

2            THE COURT:  I did.  I have sentencing memos from both

3    sides, and I've got the defendant's written allocution.

4            MR. RUTH:  Okay.  The government's sentencing memo I

5    received yesterday late in the day.  I don't remember exactly

6    what time.  I have not had an opportunity to go over that memo

7    or to even show that memo to my client.

8            THE COURT:  Okay.

9            MR. RUTH:  It's just the timing of it.  I set up a call

10   with the client yesterday afternoon.  I went over everything

11   with him.  I read things to him.  Everything was square, but

12   then I got that after that fact, and I was not in a position to

13   do that.

14           THE COURT:  Okay.  Well, it did come in -- it came in

15   late.  I believe it was responsive to your sentencing

16   memorandum, which also I think was late.  I like things for the

17   sentencing two business days in advance.  I got your sentencing

18   memo the day before, and then that night then I got the

19   defendant's [verbatim] submission.  The defendant's submission

20   was really not a memo.  It was just three articles that were

21   attached, and so we will discuss those.  I would like all of

22   this stuff to be submitted to me in time to digest it for my own

23   purposes as well as for the other side's purposes before the

24   sentencing hearing.

25           So we'll discuss the articles, and I'll give you my

1    reaction to them as well, but the sentencing memorandum, there

2    was no memo other than the three attachments that were submitted

3    by the government.

4              MS. PFLUGER:  Your Honor, may I speak for a moment?

5              THE COURT:  Go ahead.

6              MS. PFLUGER:  My sentencing memo was not a memo.  It

7    was only three articles, and I had considered asking for an

8    adjournment of the sentencing because there were just things in

9    Mr. Ruth's memo that I need to address.  I didn't ask for an

10   adjournment.  Instead, I didn't put anything in there except

11   those three articles, and I realize they were late.  I was just

12   trying to give a little bit of a response to Mr. Ruth's memo.

13             THE COURT:  All right.  We'll discuss it in a -- we'll

14   get into it.

15        Okay.  Mr. Ruth, have the factual clarifications that you

16   proposed been adequately reflected in the revised report?

17             MR. RUTH:  Yes.

18             THE COURT:  All right.

19        All right.  Ms. Schenck, I need to make sure that you've

20   reviewed the presentence report and the addendum and the revised

21   presentence report and that you discussed those documents with

22   your lawyer.  Have you done that?

23             THE DEFENDANT:  Yes, I have.

24             THE COURT:  Do you have any other concerns with the

25   sentencing memorandum?

1          THE DEFENDANT:  No, I don't.

2          THE COURT:  I'm sorry.  With the presentence report?

3          THE DEFENDANT:  No.

4          THE COURT:  All right.  Okay.  I'm going to accept the

5   facts in the presentence report as the facts on which I'll base

6   my sentence.  I'll adopt those facts as the facts on which I'll

7   base my sentence.  I accept the plea agreement.  The offense of

8   conviction adequately reflects the defendant's criminal conduct.

9   The plea agreement does not undermine the statutory purposes of

10  sentencing.  In determining the defendant's sentence, I will

11  take into consideration the advisory sentencing guidelines and

12  the statutory purposes of sentencing that are set out in Title

13  18 of the United States Code at Section 3553(a).

14      All right.  I think we're -- with the factual

15  clarifications that are reflected, I think we're in agreement.

16  We don't have any objections on the guidelines.  I won't walk

17  through them all because we didn't get any objections on the

18  guideline calculation.  I think we're all on the same page on

19  them, so let me just tell you where I think we have gotten, and

20  if we're all in agreement with it, I'll just endorse the

21  calculation in the presentence report.

22      Let me confirm though that the government supports the

23  third level of reduction for acceptance of responsibility.  Ms.

24  Pfluger?

25          MS. PFLUGER:  Yes, Your Honor.

1          THE COURT:  Okay.  So with three levels of downward

2     adjustment for acceptance of responsibility, we end up with a

3     total offense level of 48.  We have a criminal history category

4     of I, which means that the defendant has an advisory guideline

5     imprisonment range of 360 months.  I'll note that that is by

6     operation of the statutory maximum sentence for this case.

7     Otherwise the guideline would have been -- I believe it would

8     have been life, but we're capped at the guideline at 360 months,

9     which is the statutory maximum.

10         Are we all in agreement that that's where the guidelines

11    take us?  Ms. Pfluger?

12         MS. PFLUGER:  Yes, Your Honor.

13         THE COURT:  Mr. Ruth?

14         MR. RUTH:  Yes, sir.

15         THE COURT:  Okay.  All right.  So that's what the

16    guidelines tell us.  So let's proceed with the sentencing

17    arguments, and then we'll address the fact that we got these

18    academic articles kind of late in the game and what we should do

19    about that.  In light of my response to them -- well, I'll give

20    you my reaction to them.

21         So go ahead, Ms. Pfluger.

22         MS. PFLUGER:  Yes, Your Honor.  The government read the

23    defendant's sentencing memo, and, like I said, we had thought

24    about asking for a continuance because I was somewhat shocked by

25    some of the claims made in there, and I will address those.  But

1    basically the defendant's sentencing argument minimizes the

2    seriousness of this crime and the seriousness of the harm caused

3    by it and minimizes the defendant's responsibility for this

4    crime.  So what I wanted to do in my sentencing argument is kind

5    of go over the 3553 factors and address each one of those, if

6    that's all right with the Court.

7              THE COURT:  Go ahead.

8              MS. PFLUGER:  So, first, I wanted to go into the nature

9    and circumstances of the offense.  In Mr. Ruth's sentencing

10   memo, the defendant's sentencing memo says that, "Well, even if

11   we assume the alleged conduct did occur," and what I can say to

12   that is the nature and circumstances of this offense are not in

13   question.  The defendant has pleaded guilty to taking a photo,

14   which the time/date stamp in the computer shows that it was

15   taken July 11th, 2018.  It was an image of his 2-year-old

16   daughter's vagina.  The other images were close-ups of her

17   vagina with his hands in the photo spreading her labia or

18   touching her thighs to get a better shot of her vagina.  What is

19   also not in question, even though the defendant didn't plead

20   guilty to it, but the evidence clearly shows that Ms. Schenck

21   sent images of her daughter's vagina to a woman in North

22   Carolina [verbatim], and with those images one was of her

23   daughter's vagina, saying, you know, "This is a pussy pic," and

24   the next one was semen on her daughter saying, "I came on my

25   daughter."  So that's not in question.

1          Then Ms. Schenck's wife talked to law enforcement and said

2     Ms. Schenck had initially disclosed the abuse of the daughter

3     starting in 2017 when the daughter was 1 year old, and that's in

4     paragraph 8 to 9 of the PSR, which was not objected to.  He also

5     tried to convince his wife to join him.  So this abuse had

6     started at least a year prior.  This was not a one-time event.

7     This was Ms. Schenck sexually abusing his daughter and taking

8     pictures of it and sharing those pictures.  So none of that is

9     in question, although what Ms. Schenck pled guilty to was the

10    production of one image.  So that's the nature and circumstances

11    of the offense.

12          As to the serious --

13          THE COURT:  I think you said North Carolina, not that

14    it's a material difference.  I think it's North Dakota.

15          MS. PFLUGER:  You're right.  I'm sorry.  North Dakota.

16          As for the seriousness of the offense, the defendant's

17    sentencing memo says that the infant daughter was 2 years old at

18    the time of the photos and at that age she'll have no memory and

19    so she won't suffer any emotional or mental health consequences

20    and no physical consequences, and that really was just shocking

21    to me because it's just not true, and that's why I submitted the

22    articles.  And I'm not going to cite them, but I think some of

23    what I'm going to say is just common sense.  And also the

24    defendant's punishment shouldn't be based on the harm to the

25    victim.  It should be on the conduct that the defendant did.

1    But I think that the harm to the victim informs us as the
2    seriousness of this offense in this case, and that's going to be
3    future harm.

4         So, I mean, just to say that if a child is preverbal and
5    sexually abused and images are taken of that there's no
6    consequences is just ridiculous.  You know, there are ACE,
7    adverse childhood experiences, that are widely recognized, and
8    these ACEs, there have been studies that examine the
9    relationship between early childhood adversity and lifelong
10   effects, and there's negative consequences through the entire
11   life of the victim based on these kind of adverse childhood
12   experiences.  Research has found that it will be a lifelong
13   struggle, and for infants and toddlers who have chronic stress,
14   these adverse childhood experiences can cause changes in their
15   brain.  And, you know, the article that I submitted cited to
16   that, but it's also, I think, just pretty well accepted
17   knowledge that trauma impacts brain development of very young
18   children, and that will cause physical, emotional, and
19   educational issues in the future.

20        So Ms. Schenck sexually abusing his daughter is one
21   childhood adverse experience, but that doesn't even mention now
22   this child is going to grow up with a parent incarcerated, being
23   in foster care, being in a home where there was physical abuse,
24   being in a home where there was substance abuse, the separation
25   and divorce of her parents, and these are all adverse childhood

1    experiences caused by Ms. Schenck's behavior, although that's --

2    you know, she pled guilty to production of child pornography,

3    but to say there's no consequences because the child can't

4    remember or won't remember is just absolutely not true.

5         And that doesn't take into account either that these images

6    were distributed.  There are psychological and physical

7    consequences of sexual abuse, but now Ms. Schenck's daughter is

8    a known victim of child pornography.  Her images are registered

9    with the National Center for Missing & Exploited Children, so

10   every time these images come up in the future, if she or her

11   parents choose to be notified, they will be notified that your

12   image has been found in another case, and we know these images

13   have been distributed.

14        THE COURT:  Clarify that for me.  They were distributed

15   to the woman in North Dakota, but they weren't further

16   distributed, as far as we know.

17        MS. PFLUGER:  I don't know.  I know they were

18   distributed to her.  I can't speak to whether they were further

19   distributed, but what I do know is once they're out there and

20   have been distributed, there's no reining them in.  So even if

21   it was only one person, there's no saying where these images

22   might show up in the future.  I can't predict that.

23        Did that answer your question?

24        THE COURT:  Well, sort of by negative implication.

25   There's no evidence that they were distributed more broadly than

1    the individual kind of point-to-point distribution through Kik

2    to another individual.  They weren't posted on social media.

3    They weren't on a file-sharing site or anything like that.  So

4    there's no evidence for me to believe that they were distributed

5    more broadly and are likely to show up anywhere else, and

6    Ms. Schneibel said that she deleted them immediately.

7            MS. PFLUGER:  That is correct.  While it's true that

8    the defendant was talking to a lot of people on Kik and other

9    types of messengers, there is no information that there was

10   peer-to-peer sharing or a Facebook posting or anything like

11   that.  But I do have to say, whether they are discovered or not,

12   I would imagine that as this child grows up, it will be a

13   thought in her mind that, "My images may be out there."  So

14   regardless of whether it materializes, that's going to be a

15   concern for this child in the future.

16        So the -- so I was kind of talking about the seriousness of

17   this offense, right?  So those are kind of the impacts on the

18   victim that might make it more serious, but what else shows us

19   that this is a serious event is the guideline.  The base offense

20   level was 32.  So say you have a base offense level 32 and you

21   minus 3.  That would be 29.  No criminal history.  That's a

22   guideline of 87 to 108 months, but it would be 180 months from

23   the mandatory minimum.

24        But this defendant has every aggravating factor.  This

25   defendant has plus four because the victim was under 12, plus

1   two because there was sex acts committed, plus two because she

2   distributed them, plus four because there was a toddler, plus

3   two because she abused her position as a parent and did this,

4   and then plus five because she's a repeat and dangerous sex

5   offender.  I mean, to say that this is not a serious offense,

6   the guidelines themselves show that this is the most serious

7   offense.  It's off-the-charts serious, and I think that's

8   appropriate.  And it's not even because of the defendant's

9   criminal history.  It's because of the behavior, and it's

10  because everything he did increased the seriousness by

11  exploiting this really vulnerable child.

12      You know, and the government hopes that the victim doesn't

13  suffer any of these consequences, doesn't remember, but the

14  defendant shouldn't be rewarded for choosing a victim who's

15  nonverbal and might not remember.  He chose a victim who

16  couldn't report, and so it lessened his chance of getting

17  caught, and his -- her daughter's young age really is an

18  aggravating factor, not a mitigating factor.  She abused the

19  most vulnerable, someone who cannot protect themselves, someone

20  who solely relied on her to protect her.

21      As far as the history and characteristics of the defendant,

22  I want to tie those in with the protection of the community.

23  Mr. Ruth's sentencing memo said that Ms. Schenck is deeply

24  troubled and cries out for treatment and not punishment.  I

25  mean, obviously this cries out for treatment, but that doesn't

1    mean it doesn't cry out for punishment.  Ms. Schenck clearly has

2    mental health struggles and issues.  No one is going to dispute

3    that with the lengthy mental health history.  That doesn't

4    negate the need for punishment for this abhorrent crime.

5    Ms. Schenck is a danger to society.  She sexually abused her

6    disabled brother and, again, picking on the most vulnerable,

7    someone who is physically and psychologically -- maybe not

8    psychologically -- intellectually unable to protect themselves.

9    Her brother reported that Ms. Schenck licked his penis, hit him,

10   choked him, pinched him, slapped him, and then there was a

11   second report.  And then also Ms. Schenck has admitted in

12   paragraph 15 of the PSR that he physically abused his 5-year-old

13   stepdaughter.  The stepdaughter reported being choked, being

14   thrown.  This is someone who clearly has mental health issues,

15   but that does not negate responsibility, and it does not protect

16   the public by saying, well, she needs treatment and not

17   punishment.

18        Ms. Schenck has gotten extensive treatment throughout her

19   life: psychotherapy, medication, psychiatry, inpatient,

20   counseling -- been to almost every counseling center I can think

21   of in Madison.  I made a list of them, but it's just all of them

22   near Madison -- been on medication.  I hope as much as everyone

23   here that Ms. Schenck's mental health improves while

24   incarcerated, but that does not negate a need for serious

25   punishment.

1    And then deterrence is another thing the Court should

2    consider.  In this case if the Court finds that -- well, you

3    know, defense is arguing that because the victim might not

4    remember this, then it's not as serious.  But if the defendant's

5    sentence is based on the memory from a child, then the

6    deterrence effect will encourage the abuse of those who are

7    preverbal, who can't talk, who can't remember.  We want to

8    protect infants and minors.  We don't want to encourage, well,

9    go after them because you'll get a lesser sentence because they

10   can't remember.  And I also think that we need to send a message

11   to pedophiles that you cannot target the most vulnerable members

12   of our society.  Again, the defendant, this will provide

13   specific deterrence to her.  While 15 years is a long time, 30

14   years is longer.  It will provide more deterrence, and I

15   understand Mr. Ruth's argument that this is -- you know,

16   Ms. Schenck has a sickness, but to say that you're motivated by

17   a sickness so deterrence isn't an issue just isn't accurate.

18   You can have a sickness, and there is still deterrence in

19   punishment.

20       The last thing I just wanted to touch on was this

21   sentencing to provide just punishment for the offense that was

22   committed, which is really serious.  The defendant used her

23   daughter as a sexual object for her own gratification, and the

24   daughter will forever be affected, and she will have

25   consequences the rest of her life.  The government believes that

1    a sentence of 30 years is just based on the 3553 factors, and as

2    the Court noted, you know, if there wasn't a cap on this, the

3    guidelines would have been even higher than that.  So the

4    government does ask for a sentence of 30 years, and after the

5    Court has imposed its sentence, the government will ask for an

6    oral pronouncement of forfeiture, and there's a condition of

7    supervised release we need to address.

8              THE COURT:  All right.  Let me take this time to

9    address the articles that were submitted.  Sometimes this

10   happens in criminal cases, that people will take a scholarly

11   article about some phenomenon, and they'll present it to me in

12   support of their argument.  This is a good example of that.  The

13   fundamental difficulty that I have for it is that those

14   scholarly articles are not self-explanatory, and I think of

15   myself as a fairly informed and intelligent reader of science,

16   but what I recognize is that it's three articles from a very

17   vast academic literature on the subject of childhood trauma and

18   its effect.  And so even assuming that I can understand the

19   articles when I read them, and, frankly, I think that I do, I

20   have two sort of abiding concerns.

21        One is that for me to really feel confident that I'm making

22   sense of the articles in the broader context of the state of

23   knowledge about the subject, I really feel like I would need

24   expert guidance to make sure that the articles that I have are

25   not outliers and that they really do represent something of a

1    consensus, or at least a well-supported and widely-held theory.

2    And so for somebody to just give me three articles that I could

3    then read, I just don't feel confident that I'm really getting

4    the state of knowledge about something.

5         Then when I look at the articles themselves, I recognize

6    just as a critical reader of science, they don't necessarily

7    really inform me on the decision that I have to make here

8    because I have a very specific incident of a certain kind of

9    trauma that happened to a 2-year-old, but the articles deal with

10   a very broad range of trauma.  So, for example, the first one,

11   the 1995 kind of psychoanalytic-oriented article, deals with

12   sort of five case studies that dealt with trauma that was, quite

13   frankly, really nothing like the trauma here.  One involved a

14   child who was present when a letter bomb exploded and

15   dismembered her mother, and so obviously we're talking about

16   apples to oranges in terms of a comparison there.

17        And then there was the broader study about the childhood

18   trauma events correlated to life expectancy, and my concern with

19   that article, of course, is that there are so many co-variables

20   that go into the life expectancy and that people that have

21   numbers of childhood trauma events have many things about their

22   lives that may lead to shorter lives.  And so I would need

23   somebody to help me make sure that that study had really

24   isolated the effect of the particular trauma and isn't really

25   measuring an accumulated effect of lots of damaging things in

1    that individual's life.

2          At the end of the process here, I'm left with -- and I did

3    some of my own Google searching to see if there really was a

4    large body of literature, if the literature really reflected

5    something of a consensus, and it seems to me kind of

6    unsurprising that we reach the conclusion that you certainly

7    can't say that trauma that happens to you before you learn to

8    speak doesn't have any effect on the rest of your life.  And in

9    this case in particular I think, and I'll ask Mr. Ruth to

10   address this, the whole complex of the victim's life is now

11   going to be traumatic.  Whether that trauma is rooted in the

12   particular instance in which Ms. Schenck photographed her when

13   she was 2 years old or whether his coming on her when she was

14   naked at 2 years old has an enduring effect on her life, that I

15   really don't feel confident that I really know that that

16   incident will affect this child for the rest of her life.  I do

17   know that she's now got a really rough start in life, and she

18   will be separated from her mom and from her dad and resettled in

19   a new home, and all of that raises really profound concern about

20   her well-being over the long haul.  But whether I can extract

21   from these particular academic articles some assessment that the

22   crime here is going to result in some long-term maldevelopment

23   of her neurological system, that is something I just don't feel

24   comfortable concluding.

25         I'll also say this:  I don't think that I really need to

1    understand the impact of trauma on the development of the child

2    brain to really render a just sentence in this case, and I sense

3    that, from Ms. Pfluger's sentencing presentation, that she's not

4    really relying on these articles in support of her sentencing

5    recommendation.  She clearly cited them, despite saying she

6    wasn't really going to cite them.  I mean, I think you are

7    citing them.  But this is a long-winded answer to say I really

8    think that there's a common sense concern with the impact of

9    this crime on the victim, as there is in every case, and that

10   the just punishment doesn't really depend on a scientific

11   assessment of the damage to this individual victim, which at

12   this point we probably, even with the best scientists, probably

13   couldn't really determine to any reasonable degree of certainty

14   about what's going to happen to this particular individual over

15   a long period of time.  I will say that she was harmed by the

16   crime and by the experience that the crime created for her, but

17   it's not something that I can really realistically assess

18   scientifically.

19        I will also say this:  I think the harm to the victim is

20   always a factor that I consider in determining what a just

21   sentence is, but I also have to recognize that the harm to the

22   victim doesn't always match up perfectly to the seriousness of

23   the offense.  I'll just give you one example:  Sometimes people

24   deal drugs that have some nasty poison mixed in, and the person

25   who is dealing the drugs doesn't really intend to kill anybody.

1    It's just that they were unlucky, and the consequences of their

2    act were far worse than they really intended, but it's not like

3    I ignore it either because that risk of that kind of poisoning

4    in dealing street drugs is ever-present.  And so I have to

5    recognize the harm to the victim, but sometimes I also have to

6    recognize that the actual harm that befalls the victim isn't

7    perfectly correlated to the culpability of the defendant.

8        All right.  So I've sort of framed the discussion a little

9    bit here for Mr. Ruth, but go ahead, Mr. Ruth.  I've given you

10   my assessment of the articles, but I'm open to whatever else you

11   want to add to the discussion.  So go ahead.

12       MR. RUTH:  Okay.  Thank you, Judge.

13       I agree on the articles that the situations don't compare.

14   This -- I think that this has kind of moved to the forefront,

15   the harm to the victim as the essential factor.  Maybe it's

16   because I listed it first in my memo.  My only point is the

17   harm -- more harm to the victim makes the offense worse.  Less

18   harm to the victim makes the offense not better but less worse,

19   and that's all I'm trying to point out, that I -- you know, to

20   you and I, to adults, to everyone here that hears what happened,

21   it's shocking.  It has tremendous shock value, and it sounds

22   like something that to us is traumatic, but, quite frankly, I

23   don't know how a 2-year-old could perceive the alleged events in

24   this case as traumatic.  I don't know that a 2-year-old would

25   have any perception at all about what's going on.  Quite

1   frankly, I think the fact that this child is now going to be

2   adopted and will be raised by adoptive parents, now that's

3   something that's likely to be an event that impacts the child

4   throughout the child's life.  I think that's much more likely

5   than this child perceiving these events as traumatic and then

6   being impacted by them.  That's the only point I'm trying to

7   make is that, God willing, this child won't be negatively

8   impacted by these events, and I think that it's highly likely

9   that she won't be.

10      You know, the government says things like, "Oh, to say this

11  is not serious."  I've never said this is not serious.  This is

12  super serious.  It's shocking.  But so is 15 years.  15 years is

13  a long, long time.  You know, it provides -- if you want to talk

14  about deterrence, I can't imagine anybody not being deterred by

15  a 15-year sentence and saying, "Wow, if I'm only going to get 15

16  years, maybe it's worth it," or, "If I'm only going to get 15

17  years, maybe I should target preverbal children for this type of

18  thing."  That's just silly talk.  Anyone would be -- Mr. Schenk

19  is deterred by 15 years, and anyone who hears about this case is

20  deterred by 15 years.

21      I think what it comes down to really, every single

22  sentencing factor is addressed by 15 years.  The only one that's

23  potentially a wobbler is punishment, and I come back to the fact

24  that punishment, you're supposed -- it's the minimum amount that

25  addresses the factors, and the fact that Mr. -- I call him

1    mister.  I am in the habit of calling him Mr. Schenk.  You all

2    have called him Ms. Schenck.  I don't mean to offend anybody or

3    to step on any toes.  I'm just -- that's the habit that I have

4    been in.  That Schenk accepts responsibility.  He knows he has a

5    problem.  He knows he needs treatment.  He wants treatment.

6    There's treatment available to him.

7         You know, when you pick, "Well, how much punishment do I

8    need?  How hard do I have to hit this person?" that's guesswork

9    at best, and I think a person could justify a higher sentence,

10   but that's not really the test.  What can I justify isn't the

11   test.  What's the minimum amount of punishment to address these

12   factors, and I think 15 years is it.  It's an extraordinary

13   sentence, and it's not the end of it.  You know, you've got --

14   you impose a 15-year sentence, you impose supervised release,

15   and then you could have your hooks into Schenk for the next 30

16   years as a result of that.  So if he doesn't change, if he isn't

17   rehabilitated, if treatment doesn't take, he goes right back to

18   prison.  So I think when you add it all up, Judge, a 15-year

19   sentence is the appropriate sentence, and that's the sentence I

20   urge you to impose.

21        THE COURT:  Well, let me push back.  You said

22   punishment was the only factor that would arguably support a

23   sentence above the mandatory minimum, but what about protection

24   of the public?  I think Ms. Schenck has demonstrated that she's

25   victimized individuals who are vulnerable.  She's been in

1    treatment before.  It hasn't stopped her from committing the

2    offense here, and so -- and, again, every day that I have her

3    incarcerated is a day that she can't assault someone else.

4            MR. RUTH:  Sure.  Well, first of all, the treatment

5    that Schenk has been in up to now hasn't been sex offender

6    treatment.  It's been treatment related to suicide attempts and

7    suicidal ideation is my understanding.  I haven't seen anything

8    that says that he was specifically in sex offender treatment.

9    He certainly hasn't participated in sex offender treatment

10   through the Bureau of Prisons for 15 years.  And so, sure, if

11   you -- if you think that he can't be cured, that this is it,

12   this is the person you're going to have from now until the end

13   of time, well, then, yes, more incarceration means protection of

14   the public.  But I think that this is a person who can be cured,

15   and I think that 15 years in the Bureau of Prisons, there's a

16   decent chance that he will be cured.  There's a decent chance

17   that he can be released to society, and so -- and if he's not,

18   you have him on supervision.  So it isn't just a question of put

19   him in, let him out to go back and do what he was doing.  Put

20   him in, treat him, and then let him out on conditions and keep a

21   close eye on him.  And so I think you can address the protection

22   of the public with 15 years.

23           THE COURT:  All right.  Ms. Schenck, let me start out

24   with this:  You get to decide how you want to be referred to

25   as -- I gather you're transitioning to female, so we've sort of

1    internally and in the presentence report adopted feminine

2    pronouns for you, but it's up to you.  What would be your

3    choice?

4            THE DEFENDANT:  Feminine, Your Honor.

5            THE COURT:  All right.  You've got the right to address

6    me before I decide what your sentence should be.  You don't have

7    any obligation to say anything, and I do have your letter, but I

8    would be eager to hear anything else that you want to add.  So

9    would you like to add anything?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Go right ahead.

12            THE DEFENDANT:  Just going back off of my letter, I

13    just want to make sure that, you know, it is seen that I am

14    taking responsibility for this and that, like, one of the things

15    that I want to make sure that's prevalent is I need treatment,

16    and I'm willing to accept treatment.  And I've had a lot of

17    things happen to me in my life that I have not dealt with, and

18    that is my own fault and does not negate why I'm incarcerated,

19    but I think that given the time and given the treatment, I would

20    be able to be a productive member of society.

21        And while I've been incarcerated in Dane County and now

22    Sauk County, I have made sure to utilize the mental health

23    resources available to me, and even though it's not the

24    intensive treatment that I'm going to need, I think it's still a

25    step in the right direction.

1          THE COURT:  Tell me about the treatment you've had

2    before.  I know that you had some treatment through the Midwest

3    Center for Psychotherapy, and I think, if I understand that

4    correctly, that was related to kind of a prerequisite to your

5    having hormonal therapy.  Am I understanding that right?

6          THE DEFENDANT:  So I've kind of gone to different

7    places.  So some of it was just purely mental health,

8    depression, stuff like that.  I came out almost seven years ago

9    as transgender, and in correlation with my doctor, she wanted to

10   make sure that I was mentally stable to take the hormone

11   treatment.  She had okayed the treatment in 2015.  The reason I

12   did not take it at that time was due to wanting to have a

13   family, and then -- so I'm currently on it now, but any other

14   treatment was usually for depression, anxiety, suicidal

15   ideation, that kind of thing.

16         THE COURT:  Okay.  All right.  And so did that

17   treatment at any time deal with your -- I don't know -- I'll say

18   this -- sexual deviance, so the interest in children, interest

19   in incest, any of the other things that are presented in the

20   presentence report?

21         THE DEFENDANT:  No.  When -- before I got arrested, I

22   was seeing Ms. Arena (ph.) at Journey Mental Health.  The only

23   thing that we really started to address was the mitigating

24   factors of the physical abuse of my ex's 5-year-old daughter,

25   and, given time, I believe I would have been able to address the

1    sexual aggravating factors as well.

2            THE COURT:  Okay.  All right.  Anything else you want

3    me to know or consider before I decide what your sentence should

4    be?

5            THE DEFENDANT:  No.

6            THE COURT:  All right.  I'm going to take a break here.

7    You can stay on the line.  I'm just going to mute my audio and

8    my video and get my thoughts together here, and I'll be back in

9    a couple minutes.

10       (Recess taken from 1:40 p.m.–1:47 p.m.)

11           THE COURT:  All right.  I'll wait for counsel to return

12   here.

13       All right.  Thank you for your patience.  Let me walk

14   through my kind of assessment of what I have heard today and

15   what I read in the presentence report and all your submissions.

16   Thanks to counsel for their able presentations.

17       Let me start by talking about deterrence.  I think that --

18   I think deterrence here is an important factor in terms of

19   specific deterrence in terms of what my sentence will do for

20   Ms. Schenck.  I do think that a serious sentence, which I am

21   bound to give at 15 years as a mandatory minimum, will have a

22   deterrent effect on her.  I'm often not persuaded and I'm not

23   persuaded here that there's really a general deterrent effect to

24   my sentence because I don't think this is a category of criminal

25   behavior that is really amenable to much deterrence.  I think

1    that the penalties are draconian.  I think that people, if they

2    stop to think about the penalties, would recognize that a

3    draconian sentence if you got caught would be likely, but it

4    just doesn't stop people.  We have imposed really long sentences

5    for sex crimes, particularly involving children, and it --

6    honestly, I think it is the kind of compulsion that is not

7    really amenable to general deterrence.

8         So I would, if I thought it would make a difference in some

9    future case, send a message here, but I just don't think that

10   this is the kind of criminal conduct that is deterred by a

11   message sending Ms. Schenck to a long term of incarceration

12   hoping that somebody else will recognize that their conduct is

13   something that should be avoided.  I just don't think that's

14   realistic.  I certainly don't want my sentence to suggest that

15   you're better off molesting a preverbal child because they won't

16   be able to report on you, but I think that that is, quite

17   honestly, one of the reasons that children get abused is that I

18   think people can take advantage of their positions with children

19   and avoid detection, because the children are either scared to

20   report or what have you.  But general deterrence is not really a

21   motivating factor here.  Punishment is.

22        This is a very serious offense.  I have in many child

23   pornography cases complained that the guidelines are unduly

24   harsh given the genesis of the guidelines and how they're

25   structured, and I think that's the case here as well.  I don't

1    really find that the sentence that the guidelines recommend is
2    really properly calibrated.  That said, I do find something
3    about the guidelines informative here, and that is that the
4    number of enhancements that are available in a child pornography
5    case does give me a good framework, kind of an inventory, if you
6    will, of the kind of factors that I can consider when I evaluate
7    how serious a particular offense is.  And Ms. Pfluger kind of
8    made -- kind of hit the nail on the head here, and that is that
9    this crime really hits all of the aggravating factors in terms
10   of the nature of the victim and the conduct and the
11   distribution.

12        All of that, I think, indicates to me that this is a
13   particularly serious offense, and, of course, it's in a
14   completely different category than many child pornography cases
15   because it involves a hands-on offense against a child.  And so
16   it is, I think, by almost any measure a very serious offense,
17   and not just because of its shocking nature.  I think we're
18   often offended and shocked by the sexual nature of the crime
19   when we have sex crimes, and in child pornography cases there's
20   just something that's sort of morally distasteful about them,
21   but this one is shocking not just because it involves sexual
22   conduct with a child but because of the vulnerability of the
23   victim and the distribution as well.

24        And I think, quite honestly, although I'm discounting the
25   scholarly articles that were presented to me, I think there's no

1    escaping the fact that the risk of long-term damage to this

2    victim is really quite high.  And, again, I'm not talking about

3    what I think is going to happen to the development of her

4    neurological system.  I'm just talking about the fact that this

5    crime and its aftermath has more or less destroyed her family,

6    and so now she's going to be resettled with an adoptive family,

7    and that carries a certain amount of trauma and a requirement of

8    some readjustment, and then I think it's highly likely that she

9    will not escape this story of her birth and family situation and

10   how it ended up that she was put up for adoption.  And so

11   there's a strong possibility that this story will follow her and

12   that this will be, whether it's a direct kind of neurological

13   trauma for her, this is a traumatic story, a part of her

14   biography that she may well have to deal with for a long time.

15   So I think the potential for harm to the victims here is really

16   quite great.

17         I do have to look at protection of the community, and I

18   hope Ms. Schenck is one who can be rehabilitated.  I really do.

19   But she has so far demonstrated that she is a threat to

20   vulnerable victims, to her family, and the community.  And so I

21   think that a long sentence really is appropriate as a means of

22   protecting the community, as is a long period of supervised

23   release.  And I'll also note that this is a criminal category

24   that is, frankly, just subject to very high recidivism rates.

25   We're just not very good at treating sex offenders.  It's just a

1    category with high recidivism, and the result of an incidence of

2    reoffense really has devastating consequences.  So I am very

3    keenly concerned with protecting the public from Ms. Schenck.  I

4    think there is just no avoiding the fact that she represents a

5    real danger to the community, and I can't be completely

6    confident that with the current prison sentence of the mandatory

7    minimum and whatever treatment she can get in the Bureau of

8    Prisons that I can be confident that she's not going to

9    reoffend.

10        But I'm not going to impose the sentence that the

11   government asked for of 30 years, and I think there are really

12   three reasons for that.  First of all, this is still a young

13   offender.  Ms. Schenck is not an older person.  The reason I

14   think that that matters is that it suggests to me that because

15   she's young, it does, to me, open the possibility or increase

16   the possibility that she can be rehabilitated and that she might

17   be amenable to treatment.  She is still a young person.

18        I also think that it's important to me that she herself was

19   a victim of sexual abuse.  It's almost a commonplace that people

20   who commit sex crimes were victimized and sexualized very early

21   herself, and so it does affect my analysis here in that it

22   certainly doesn't mean that she's not a danger, but it does

23   affect my assessment of her culpability.  In some sense many of

24   her mental health problems were thrust upon her by somebody who

25   victimized her in the past, and I think it would be

1    inappropriate to not recognize that the genesis of her

2    criminality is not just cold-heartedness but some mental illness

3    that's rooted in her own trauma as well.

4         And also I will say this, that I will make here a general

5    assessment of the harm to the public and to the family.  I think

6    that this was a devastating, serious crime, but it could have

7    been so much worse and not just because the victim was too young

8    to talk about it, but the distribution could have been greater.

9    The abuse went on for a period of time, but it could have gone

10   on longer.  It could have been more severe.  And so I don't mean

11   to diminish it at all.  As I said, I think of this as a very

12   devastating crime, but on the spectrum of the kinds of sexual

13   abuse of a child that we could see, horrifying and shocking,

14   yes, but it is not at the outer limits of the spectrum of horror

15   that is visited on small children sometimes.

16        So the bottom line -- this is definitely not an exact

17   science, as I think we all understand -- my assessment is

18   balancing all the considerations that I have, a sentence of 20

19   years is sufficient but not greater than necessary to serve the

20   purposes of sentencing here.  It's somewhat over the mandatory

21   minimum, but it sends a message of disapproval to Ms. Schenck.

22   It provides about two decades of protection by having her

23   incarcerated, and I think it really does reflect the nature of

24   the crime here.

25        That's going to be followed by 25 years of supervised

1    release, and we will talk about the conditions of that

2    supervised release in a moment, but I think that that lengthy

3    period of supervised release is necessary to reflect my abiding

4    concern that Ms. Schenck, even after a term of supervised

5    release, may have a compulsion that she is not able to manage.

6    But that is, I think, the best that we can do after a period of

7    incarceration to manage the risk that she proposes and also to

8    provide her the support that she will need to reintegrate into

9    the community and to continue her progress toward

10   rehabilitation.  That's a long time in the future, and the

11   supervised release covers a long period of time, and really

12   that's so far in the future one really doesn't know what

13   Ms. Schenck's life might hold for her.  If she transitions fully

14   as a transgender individual, her treatment for gender dysphoria

15   may be one of the best contributions that she has toward

16   mitigating her risk of committing another sexual offense.  We

17   won't really know that, but I do think that she's demonstrated

18   here the potential for posing such an acute risk that that long

19   a period of supervised release is appropriate.

20        Ms. Pfluger, I'll start with you because you raised the

21   issue.  You had a condition that you wanted to address, so let's

22   talk about that now before I check in with Mr. Ruth about the

23   conditions.

24            MS. PFLUGER:  Yes, Your Honor.  Mr. Ruth and I have

25   come to the agreement that Special Condition 14 -- it's

```
1    notification of third parties -- we came to a joint proposal
2    that that would say that probation could notify third parties
3    not of a risk but notify third parties of his criminal history,
4    including a sex offense against a minor.
5         THE COURT:  So I'm going to take out these words then:
6    I will leave it the way it is, but the words "the risks
7    associated with" come out.  So it will just be "of defendant's
8    criminal history involving a sex offense against a minor."
9         MS. PFLUGER:  Yes, Your Honor.
10        THE COURT:  All right.  That's good, and I think that
11   that makes it clear and consistent with circuit law.
12        All right.  Mr. Ruth, are there any other concerns that you
13   have with the conditions of supervised release?
14        MR. RUTH:  Judge, one concern.  It's more of a
15   question.  So I had been in communication with the Dane County
16   social worker who is handling the adoption, and I'm not a
17   hundred percent sure at what stage that is.  She refers to the
18   girls' parents as adoptive parents.  I think the adoption has
19   actually happened, but what I do know is that Mr. Schenk's
20   parental rights have been terminated.  He consented to that.
21   But, in any event, I asked if the -- if the adoptive parents are
22   willing to communicate with Jeremy, and her response was that,
23   yes, they will maintain contact with him or they're willing to
24   maintain contact with him, but there would be no contact
25   directly involving the children.
```

1        And so I look at this condition.  It says, "Have no contact

2   with victim in person, through written or electronic

3   communication, or through a third party," and I just want to

4   make clear that it would be okay for him to communicate with the

5   children's adoptive parents.

6           THE COURT:  Ms. Pfluger, do you have any input on that?

7           MS. PFLUGER:  Well, it seems from the condition -- and

8   maybe probation can weigh in on this -- but that he could

9   communicate with them without any issue but not to relay a

10  message to his children, because that would be through a third

11  party.

12          THE COURT:  Yes.  That would be my understanding of

13  this condition, and I'll also note this: that it says "unless

14  authorized by the supervising U.S. probation officer."  So if

15  there were to be contact with the victim, it would have to be

16  set up and with the consent of the adoptive parents.  And so

17  kind of to me actually sort of implicit in the condition is that

18  there would be communication with people like the adoptive

19  parents in connection with getting approval of speaking with the

20  victim herself.  Now, of course, the victim is probably not

21  going to be a minor by the time this condition comes to bear.

22          MR. RUTH:  Correct, yeah.  My concern is this: that in

23  my experience the prison system will look at conditions like

24  this and then decide who can be on your phone list or who can

25  you write to or who can you receive letters from, and so I'd

1    like there to be some clarification that he may communicate with

2    the adoptive parents.

3              THE COURT:  I'd be willing to just add that expressly.

4              MR. RUTH:  Okay.  That would be fine.

5              THE COURT:  We don't have to craft it here, but I will

6    add to Condition No. 25 the statement that the condition does

7    not prevent the defendant from communicating with the adoptive

8    parents of the victim.

9              MR. RUTH:  That's fine.  Thank you.  That's all we have

10   then, Judge, and we would waive reading of the conditions.

11             THE COURT:  All right.  And do you need any further

12   justification for any of them?

13             MR. RUTH:  No, sir.

14             THE COURT:  All right.  Then based on that waiver, I

15   won't read the conditions into the record.

16        Ms. Schenck, I will tell you that those conditions will

17   govern your conduct once you're on supervision.  And read them

18   over.  You'll have to sign and acknowledge them, and the

19   supervision is really designed to facilitate your success.  So I

20   encourage you to develop a good relationship with your

21   supervising officer and recognizing that the purpose of

22   supervised release is not to trip you up and send you back to

23   prison.  At a certain point if we have violations, they have to

24   be reported, and ultimately you could be revoked and sent back

25   to prison if there are violations, but that's not our goal.

1   Those conditions can be adjusted as appropriate during your

2   supervision.  So you can make a motion to the Court or the

3   government or the probation office could make a motion to the

4   Court to adjust those conditions if adjustments are necessary

5   during the period of your supervised release.

6       So I will adopt the conditions that are proposed and

7   justified in the presentence report.  That includes the

8   mandatory conditions that you submit a DNA specimen, that you

9   don't use illegal drugs, and you don't commit other crimes, and

10  then in addition I'll impose conditions 1 through 5, 7 through

11  11, and 13 through 25.

12      All right.  So the instant offense is not drug related, and

13  the defendant has no history of drug use.  The defendant does

14  have a history of some alcohol abuse.  Therefore, the

15  requirement for drug testing is not waived, and I will provide

16  that the defendant should undertake one drug test within 30 days

17  of being placed on supervision and then at least a dozen tests

18  thereafter within the discretion of the supervising officer.

19      It is adjudged that the defendant is to pay the $100

20  criminal assessment penalty to the Clerk of Court for the

21  Western District of Wisconsin immediately following sentencing.

22      That may have been paid already, Mr. Ruth.  I don't know if

23  you know that.

24          MR. RUTH:  Yeah, I believe it was paid, Judge, yeah.

25          THE COURT:  I was just going to encourage Ms. Schenck

1    to make sure the assessment gets paid because that could

2    interfere with your ability to participate in programming in the

3    BOP, so you wouldn't want a hundred dollars to stand in your way

4    of that.

5         The defendant is to pay mandatory restitution to the Clerk

6    of Court for the Western District of Wisconsin.  At this time

7    though I don't think restitution has been requested, and I don't

8    know if we need to keep that open.

9         So, Ms. Pfluger, what's --

10         MS. PFLUGER:  Our victim/witness personnel in our

11    office have been in contact with the victim's adoptive parents,

12    and they are not requesting restitution.  Therefore, they waive

13    their right to restitution.

14         THE COURT:  Okay.  Then I will close the matter.  And

15    so no restitution has been requested, so there will be no

16    restitution [verbatim] that the defendant pay restitution.

17         Okay.  And the Amy, Vicky, and Andy Child Pornography

18    Victim Assistance Act of 2018 doesn't apply because the

19    defendant's conduct predates the effective date of the act, so I

20    don't have to worry about that assessment.

21         And the defendant does not have the means to pay a fine

22    under guideline Section 5E1.2(c) without impairing her ability

23    to support herself upon release from custody, so I impose no

24    fine.

25         I will grant the final order of forfeiture for the property

1    seized from the defendant as reflected in the forfeiture order

2    all in accordance with Title 18, United States Code, Section

3    2253.

4          And then based on the offense of conviction, the defendant

5    is required to pay the $5,000 assessment under the Justice for

6    Victims of Trafficking Act of 2015 unless she is indigent, and I

7    do find that she is indigent, so I will waive that assessment.

8          And the probation office is to notify local law enforcement

9    agencies and the state attorney general of the defendant's

10   release to the community.

11         I believe we've got some counts to be dismissed.

12             MS. PFLUGER:  Yes, Your Honor.  The government moves to

13   dismiss all counts aside from the count that the defendant pled

14   guilty to, which are Counts 2 through 4, I believe.

15             THE COURT:  Counts 2 through 4 are dismissed.

16         Ms. Schenck, you've got the right to appeal your conviction

17   if you think your plea was somehow unlawful or involuntary.

18   You've got the right to appeal the sentence I've just imposed if

19   you think that sentence is contrary to law somehow, but if you

20   want to appeal, you have to do it within the deadlines, and that

21   means you have to file a notice of appeal within 14 days of

22   entry of judgment in this case or within 14 days of any notice

23   of appeal that would be filed by the government if the

24   government were to appeal.  And if you can't afford the filing

25   fee for the appeal, you can apply for leave to appeal *in forma*

1    *pauperis*, which means without paying the filing fee, and if you

2    can't afford an attorney to represent you in the appeal, you can

3    apply for court-appointed counsel to represent you at government

4    expense.

5         Is there anything else we need to address today, Ms.

6    Pfluger?

7              MS. PFLUGER:  No.  Thank you.

8              THE COURT:  Mr. Ruth?

9              MR. RUTH:  No, Your Honor.  Thank you.

10             THE COURT:  And, Ms. Stieve, did I miss anything?

11             OFFICER STIEVE:  No, Your Honor.  Thank you.

12             THE COURT:  All right.  Thank you, all.

13             THE CLERK:  Court stands adjourned.

14        (Proceedings concluded at 2:08 p.m.)

15                        ***

16

17

18

19

20

21

22

23

24

25

1         I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that the

3    foregoing is a true and accurate record of the proceedings held

4    on the 9th day of July, 2020, before the Honorable

5    James D. Peterson, Chief U.S. District Judge for the Western

6    District of Wisconsin, in my presence and reduced to writing in

7    accordance with my stenographic notes made at said time and

8    place.

9         Dated this 29th day of July, 2020.

10

11

12

13

14

15                    _____/s/ Jennifer L. Dobbratz_____

16                 Jennifer L. Dobbratz, RMR, CRR, CRC
                  Federal Court Reporter

17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
any reproduction of the same by any means unless under the

25    direct control and/or direction of the certifying reporter.